IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


UNITED STATES OF AMERICA,

        Plaintiff,

   v.

DESMOND BORIS WASHINGTON,

        Defendant.

No. 3:18-cr-00522-HZ-1

OPINION & ORDER

Peter Sax
U.S. Attorney's Office, District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

    Attorney for Plaintiff

Susan F. Wilk
Office of the Federal Public Defender
District of Oregon
101 SW Main Street, Suite 1700
Portland, OR 97204

    Attorney for Defendant

1 – OPINION & ORDER

HERNÁNDEZ, District Judge:

Defendant Desmond Washington moves to suppress the results of a buccal swab and statements he made to law enforcement following his detention and arrest on October 10, 2018. The Court denies Defendant's motion because law enforcement officers reasonably detained Defendant pursuant to the execution of a search warrant of a residence and subsequently had probable cause to arrest Defendant, which led to the lawful collection of his buccal swab and statements.

## BACKGROUND[1]

On October 1, 2018, Homeland Security Investigations ("HSI") obtained a search warrant for the residence of Alexandria Carter. In the course of investigating Ms. Carter, HSI Special Agent Chad Lindsly identified Defendant as a "possible live-in boyfriend" residing at Ms. Carter's residence. Gov't Resp. Ex. 1 at 1, ECF 61-1. Agent Lindsly opined that it was "highly likely" Defendant would be at Ms. Carter's residence during the execution of the search warrant. *Id.*

Agent Lindsly testified that, leading up to the search, he conducted a "risk assessment" of the property and anyone who might be associated with the property. His assessment included a criminal history check, a review of prior contact with law enforcement, and a review of Defendant's social media accounts. Agent Lindsly also spoke with Defendant's probation officer, who said that Defendant was part of the Inglewood Bloods gang. Agent Lindsly found photographs on Defendant's Facebook and Instagram accounts that showed Defendant holding

---

[1] The Court heard testimony and received evidence related to Defendant's motion at a hearing on March 4, 2019. What follows is a summary of the Court's factual findings based on its evaluation of the credibility of the witnesses' testimony and the probative value of the evidence submitted.

firearms and wearing a red bandana, which Agent Lindsly associated with gang membership. *Id.* Defendant included captions on one of his Instagram photographs that suggested membership in the Inglewood Bloods gang and violent behavior, such as "#bloods," "#inglewoodbloods," "#gangshit," and "#shooter." Gov't Ex. 104. Agent Lindsly also testified that he watched several of Defendant's rap music videos on YouTube, including one in which Defendant held a handgun with a silver slide and wore a gold Rolex watch and red bandana. The Government presented still photos of these videos at the hearing; the gun, watch, and red bandana are visible in the photos. Gov't Exs. 102-03. Agent Lindsly also testified that Defendant's Instagram profile name was "HuntingSeason_I5daP", and that "I5daP" was Defendant's street moniker or rap moniker.

Agent Lindsly testified that he ran a search of Defendant's prior convictions and was aware that Defendant had several prior felony convictions, including felony assault, attempt to elude a police officer, and unauthorized use of a firearm. *See also* Def.'s Opp. Mot. Suppress Ex. 1, ECF 61-1. Agent Lindsly testified that, based on his review of Defendant's social media, his criminal history, his felony convictions, and the information from Defendant's probation officer, Agent Lindsly classified the operation to execute the search warrant as "high risk."

At the hearing, Defendant introduced exhibits including a satellite image of Ms. Carter's house and video footage taken by a neighbor, Eli Duke, who testified as to the authenticity of the videos. The photo and Mr. Duke's videos show that Ms. Carter's residence is on NE 50th Place—a narrow dead-end side street off NE Killingsworth Ave., a wide and busy street. There is one house, Mr. Duke's house, between Ms. Carter's residence and NE Killingsworth Ave.

At approximately 9:00 a.m. on October 10, 2018, a task force made up of federal agents from several agencies and local law enforcement executed the search warrant on Ms. Carter's residence. The Portland Police Special Emergency Reaction Team (SERT) was responsible for

clearing the residence. The SERT team drove onto NE 50th Place in a large, wide police van. There was a sniper on the top of the vehicle and over a dozen officers who were fully armed and wore body armor and helmets. The SERT team used a loudspeaker to announce their presence and order the occupants of Ms. Carter's residence to come out. Agent Lindsly testified this is called a "call-out warrant" because the police call the residents out and they can exit voluntarily.

Defendant, Ms. Carter, and a minor child all exited the residence voluntarily and unarmed. Defendant was barefoot and in his underwear. The police handcuffed Defendant and walked him to an unmarked police vehicle on NE Killingsworth Ave., where they placed him in the back of the vehicle. Defendant's witness, Federal Public Defender paralegal Kip Manley, testified that the distance from the residence to the police vehicle on NE Killingsworth Ave. was approximately 230 feet. After the SERT team ensured that the residence was clear of people, they turned the search over to Agent Lindsly and HSI. Agent Lindsly testified that he was told by Portland Police officers that they had seen several firearms in the residence, including a handgun in the master bedroom dresser drawer.

Agent Lindsly testified that, at approximately 9:30 a.m., Defendant was led back into the residence in handcuffs. He was allowed to use the bathroom and put clothes on. Then, he was taken outside again and placed into another unmarked police vehicle in front of the residence, approximately 20 feet from the front door of the residence.

While Defendant was being detained, HSI agents searched Ms. Carter's residence. During the search, agents found in a bedroom dresser drawer a black Taurus handgun with a silver slide, a gold watch, a gold dental grill, necklaces, and a pendant with the name "I5daP" (Defendant's rap name moniker). Gov't Resp. Ex. 2 at 2. Agent Lindsly testified that he believed the handgun looked like one the Defendant held in a Facebook photo and that the gold watch

looked like the gold Rolex watch Defendant wore in his YouTube video. Agent Lindsly testified that agents took a photo of the drawer. Gov't Ex. 108.

Agent Lindsly testified that, at approximately 10:00 a.m., he interviewed Ms. Carter, who was also being detained. When shown a photo of the dresser drawer, Ms. Carter claimed that the gun in the photo was hers.

Agent Lindsly testified that, at approximately 11:15 a.m., he interviewed Defendant while Defendant was in the police vehicle. According to Agent Lindsly, he believed he had probable cause to arrest Defendant before he interviewed him, due to the presence of the gun in the drawer with Defendant's personal belongings. However, to gain information from Defendant, Agent Lindsly told Defendant he was being detained, and he was not under arrest. Agent Lindsly advised Defendant of his *Miranda* rights and Defendant signed a pre-printed *Miranda* rights form at approximately 11:12 a.m., acknowledging that he understood his rights. Gov't Opp. Mot. Suppress Ex. 5, ECF 61-5.

Agent Lindsly showed Defendant a photo of the dresser drawer and asked him about the items in the drawer. Defendant admitted that the clothing, money, and jewelry were his, but he denied that the gun was his and denied knowledge that the gun was in the drawer. Then, Agent Lindsly told Defendant he was under arrest. Another agent took a buccal swab to collect his DNA. Gov't Opp. Mot. Suppress Ex. 4 at 3, ECF 61-4. The interrogation ended at approximately 11:41 a.m. Gov't Opp. Mot. Suppress Ex. 3 at 4, ECF 61-3. Defendant was taken to Multnomah County Jail. *Id.* Agent Lindsly testified that the search ended between approximately 12:30 p.m. to 1:00 p.m.

On November 6, 2018, a federal grand jury indicted Defendant on one charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

**STANDARDS**

The Fourth Amendment protects against unreasonable searches and seizures by the government. U.S. Const. Amend. IV; *Elkins v. United States*, 364 U.S. 206, 213 (1960) (applying Fourth Amendment protections to states and state actors through Fourteenth Amendment). A person is seized if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) ("Washington I") (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks omitted)). A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

**DISCUSSION**

Defendant's primary argument is that his detention constituted a *de facto* warrantless arrest without probable cause. He moves to suppress evidence derived from this alleged constitutional violation. The Court denies Defendant's motion because the Court finds that law enforcement agents had the authority to detain Defendant while the residence was searched and that they had probable cause to arrest Defendant due to finding the handgun in the dresser drawer with Defendant's belongings. Similarly, Defendant's constitutional rights were not violated when he was interrogated and administered a buccal swab.

**I.    The detention of Defendant during the execution of the search warrant was lawful.**

The Supreme Court has clearly established that a warrant to search a home "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981). "An officer's authority to detain

incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005). The categorical "rule in *Summers* extends farther than some earlier exceptions [to the general rule that Fourth Amendment seizures are only reasonable if based on probable cause] because it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." *Bailey v. United States,* 568 U.S. 186, 193 (2013). "The rule announced in *Summers* allows detention incident to the execution of a search warrant 'because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial.'" *Id.* (quoting *Muehler,* 544 U.S. at 98).

      The Supreme Court refined the *Summers* rule in *Bailey v. United States*, 568 U.S. 186 (2013). The question presented in *Bailey* was "whether the seizure of the person was reasonable when he was stopped and detained about a mile away from the premises to be searched when the only justification for the detention was to ensure the safety and efficacy of the search." *Bailey*, 568 U.S. at 189-90. The Court held that the *Summers* rule is spatially constrained to the "immediate vicinity" of the premises to be searched. *Bailey,* 568 U.S. at 201-02. The occupants in *Bailey* were too far away to justify the detention: "Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification." *Id.* While not defining the meaning of "immediate vicinity," the Court provided a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, "including the lawful limits of the premises, whether the

occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." *Id.*

Defendant argues that *Bailey,* not *Summers*, applies to this case. While there are lessons to draw from *Bailey,* it is distinguishable from this case. Importantly, Defendant was not a mile away when he was detained, as the defendant was in *Bailey*. Defendant was in Ms. Carter's residence at the beginning of the execution of the search warrant; therefore, the categorical rule from *Summers* applied to the police's authority to detain him.

After Defendant exited the residence, the factors identified in *Bailey* all weigh in favor of a determination that Defendant was detained in the "immediate vicinity of the premises to be searched" and, thus, *Summers* still applied. *See id.* As the photo of Ms. Carter's residence and Mr. Duke's video showed, NE 50th Place is a narrow, dead-end street. There was not a lot of space left on the street in front of Ms. Carter's house once the police brought in the SERT vehicle and officers. Therefore, the police walked Defendant down the street, past one house, to a police vehicle that appeared from the video to be within the line of sight of Ms. Carter's residence. While the Court acknowledges that Defendant was not held within the lawful limits of the premise, he was in the closest location reasonably available to the police as they conducted their search 230 feet away. Furthermore, Defendant was detained 230 feet away for approximately 30 minutes. Then, he could return to the residence to use the restroom and put clothes on, at which point he was held in a different unmarked police vehicle directly outside of the residence, approximately 20 feet away. Due to his proximity to the residence, his line of sight, and the ease of reentry, the Court concludes that Defendant was within the immediate vicinity of the premises to be searched and, thus, law enforcement agents had the categorical authority to detain him incident to the execution of the search warrant.

## II. The detention of Defendant was reasonable.

Defendant argues that he was under *de facto* arrest from the moment he was detained at the residence for six reasons:

1. A substantial number of armed police officers were present during the execution of the search warrant;
2. Defendant was seized at gunpoint;
3. Defendant was unarmed;
4. Defendant was cooperative with law enforcement;
5. Defendant was placed in handcuffs; and
6. Defendant was locked in a police vehicle while police conducted the search.

Def. Mot. Suppress 7. Because the detention of Defendant was reasonable, the Court rejects Defendant's argument that he was under *de facto* arrest.

The Ninth Circuit has explained, pursuant to *Summers*, that "[t]o determine whether a detention incident to a search is constitutionally reasonable, we balance the law enforcement interests served by the detention against the public's privacy interests." *Dawson v. City of Seattle,* 435 F.3d 1054, 1066 (9th Cir. 2006) (citing *Ganwich v. Knapp,* 319 F.3d 1115, 1120 (9th Cir. 2003)).

> We interpret the Supreme Court's language [in *Mena v. Muehler*] to mean that the duration of a detention may be coextensive with the period of a search, and require no further justification. The police do not, however, have unfettered authority to detain a building's occupants in any way they see fit. *Muehler* confirms an officer's authority to detain a building's occupants during a search so long as the officer conducts the detention in a reasonable manner.

*Id.* at 1066.[2]

In *Muehler v. Mena,* police officers obtained a search warrant for a residence in which they suspected a gang member lived. 544 U.S. 93, 95 (2005). The officers suspected the gang member was armed and dangerous. *Id.* at 95-96. A SWAT team secured the residence before the

---

[2] The Court held that *Muehler* and *Summers* apply to searches for evidence as well as contraband. *Dawson*, 435 F.3d at 1066.

search. *Id.* at 96. In so doing, the SWAT team entered the bedroom of Respondent Mena, "clad in helmets and black vests adorned with badges and the word 'POLICE'" and placed her in handcuffs at gunpoint. *Id.* The police detained Mena in a garage along with other occupants of the house. *Id.* She was guarded by 1-2 officers and remained in handcuffs for 2-3 hours until the search concluded. *Id.* at 96, 100.

The Supreme Court held that Mena's detention was permissible under *Summers*. *Id.* at 98. The Court explained:

> An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure. Thus, Mena's detention for the duration of the search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search. Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention. Indeed, *Summers* itself stressed that the risk of harm to officers and occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Muehler,* 544 U.S. at 98–99 (internal quotation marks and citations omitted). The Court acknowledged that the use of handcuffs and the detention in the garage rendered the detention more intrusive than the one in *Summers*. *Id.* at 99. However, it found the use of force reasonable where the warrant authorized a search for weapons, a wanted gang member resided on the premises, and there was a need to detain multiple occupants. *Id.* at 100.

In *Dawson v. City of Seattle,* plaintiffs were tenants of boardinghouses inspected by public health officials and secured by Seattle police. 435 F.3d 1054, 1056 (9th Cir. 2006). Public health officials obtained a search warrant to inspect the houses for public violations. *Id.* at 1058. The police helped execute the warrants by securing the houses and gathering all tenants in one location. *Id.* One tenant, Ade, contended that the police officers did the following: presented him with the warrant but did not give him time to read it, had their guns' holster straps unsnapped,

threatened to break down the doors if Ade did not accompany them and unlock the door, drew their weapons, frisked tenants, and screamed at them. *Id.* at 1059. The tenants were detained for approximately two hours in a secure room in the house. *Id.*

The Court concluded that the detention was reasonable because, in the absence of being detained, the building occupants may have fled, rendering themselves unavailable to answer questions pertinent to the search; or they may have impaired the search. *Id.* at 1066. In addition, the police did not know exactly how many people were inside the houses or what dangers they posed. *Id.* The Court found it reasonable that the police would enter with weapons drawn, where they were concerned about encountering possible violence. *Id.* at 1068. The Court also was not persuaded that a violation occurred when the police did not allow a tenant to retrieve her shoes prior to being detained. *Id.* at 1070.

Taken together, these cases suggest that the six reasons Defendant contends make his detention a *de facto* arrest as opposed to a lawful *Summers* detention are unavailing. Agent Lindsly testified that law enforcement obtained a warrant to search for evidence and contraband, including for violations of drug and weapons charges. Law enforcement knew that Defendant likely resided at the premises, he was a convicted felon and a self-identified gang member, and he posted multiple pictures of himself with firearms. Such information justified a substantial number of armed officers present during the execution of the search warrant. The fact that Defendant was placed in handcuffs, even though he was unarmed and cooperative, is similar to *Muehler*. *See Muehler*, 544 U.S. at 95 (reasonable to detain occupant at gunpoint, place in handcuffs, and detain for 2-3 hours). If anything, it was more reasonable for the police to treat Defendant this way, given that he was a known felon and suspected gang member, whereas in *Muehler,* the detained woman was not a gang member and merely resided in the same house as a

gang member. *Id.; see also Bailey,* 568 U.S. at 195 ("The reasoning and conclusions in *Muehler* in applying the *Summers* rule go quite far in allowing seizure and detention of persons to accommodate the necessities of a search."). In sum, the way Defendant was detained was reasonable.

### III. Agent Lindsly had probable cause to arrest Defendant.

Once Agent Lindsly saw the photo of the Taurus handgun in the dresser drawer of Ms. Carter's residence, he had probable cause to arrest Defendant. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) ("Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested.").

Prior to the execution of the search warrant, Agent Lindsly had seen Defendant's YouTube video, in which he held a handgun with a silver slide that looked to be the same as the one found in the drawer. Agent Lindsly had seen Defendant in the same video wearing a gold Rolex watch that appeared to be the same as the watch in the drawer. And Agent Lindsly knew that Defendant's rap moniker was "I5DAP," the same as the letters on the necklace in the drawer. Agent Lindsly also knew that Defendant was a convicted felon and, therefore, if he possessed a firearm, he could be arrested. This evidence was enough to establish probable cause to arrest Defendant.

Furthermore, even if Agent Lindsly did not have probable cause upon seeing the photo of the dresser drawer, he had the authority to question Defendant, who was lawfully detained pursuant to the execution of the search warrant. Prior to questioning Defendant, Agent Lindsly advised him of his *Miranda* rights and Defendant signed a *Miranda* rights waiver. In his brief

and at the hearing, Defendant offered no evidence that he was not properly advised of his *Miranda* rights. After signing the waiver, Defendant admitted that the clothes and jewelry in the drawer were his. At that point, Agent Lindsly had an even stronger basis for probable cause to arrest Defendant.

**IV. There is no basis for suppressing Defendant's statements or buccal swab.**

Defendant's arguments for suppressing his statements and the buccal swab as the fruits of a poisonous tree are contingent upon a finding that his detention or arrest was unlawful. Because both were lawful, there are no grounds to grant Defendant's motion to suppress.

Defendant argued in his brief that, at the time of his interrogation, the agents had already completed the search. He provides no evidence for this belief. Nevertheless, he states that the only remaining tasks in the search were administrative in nature and that agents impermissibly deviated from the purpose of the search by seizing and interrogating him.

This argument is unavailing. First, the Government submits two reports, one that indicates that the search of the residence ended at approximately 12:00 p.m., and one that indicates that Defendant was interrogated at approximately 11:12 a.m. *Compare* Gov't Resp Ex 3 *with* Ex. 4. Agent Lindsly also testified that the search ended at approximately 12:30-1:00 p.m. Second, the interrogation of Defendant ensued after agents found the handgun in the residence. Thus, the search led to the interrogation, not the other way around. [3]

///

---

[3] The case cited by Defendant in his brief is inapposite. *See United States v. Landeros*, 913 F.3d 862, 864 (9th Cir. 2019). In *Landeros,* the Court asked whether law enforcement may extend a lawfully initiated vehicle stop because a passenger refuses to identify himself, absent reasonable suspicion that the individual has committed a criminal offense. Here, there is no evidence that the search was extended beyond the time needed to complete the search of Ms. Carter's residence.

13 – OPINION & ORDER

## CONCLUSION

Defendant's motion to suppress [57] is denied.

IT IS SO ORDERED.

Dated this \_\_\_1\_\_\_ day of \_\_\_April\_\_\_, 2019.

*Marco Hernández*
MARCO A. HERNÁNDEZ
United States District Judge