IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

DESMOND BORIS WASHINGTON,

        Defendant.

No. 3:18-cr-00522-HZ

OPINION & ORDER

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Peter D. Sax
ASSISTANT UNITED STATES ATTORNEY
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2902

    Attorneys for Plaintiff

Thomas Freedman
Pearl Law, LLC
610 SW Alder Street
Suite 800
Portland, Oregon 97205

    Attorney for Defendant

1 – OPINION & ORDER

HERNÁNDEZ, District Judge:

Defendant Desmond Washington moves to suppress all evidence seized pursuant to a search warrant [ECF 104]. For the reasons discussed, the Court denies the motion.

## BACKGROUND

As part of an investigation into a "rip crew" engaged in armed robbery of cannabis dealers, law enforcement agents obtained a search warrant for the residence ("Premises 4") of Defendant's girlfriend Alexandria Carter ("Carter"). Defendant, however, was not a suspect in the investigation nor a target of the search. During execution of the warrant on October 10, 2018, law enforcement agents found and seized a loaded .45 caliber handgun in a bedroom dresser drawer alongside several other items that appear to belong to Defendant.

On October 9, 2019, the grand jury returned a superseding indictment charging Defendant with Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). Trial is set for October 27, 2020.

## STANDARDS

"To be valid, a search warrant must be supported by an affidavit establishing probable cause." *Cameron v. Craig*, 713 F.3d 1012, 1018 (9th Cir. 2013) (internal quotation marks omitted). "Probable cause exists where, under the totality of the circumstances, a reasonable officer has occasion to believe that the search will uncover evidence relating to a suspected crime." *Id.*; *see also United States v. Fries*, 781 F.3d 1137, 1150 (9th Cir. 2015) ("Probable cause for a search requires a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances.") (internal quotation marks omitted).

The probable cause standard requires only a "fair probability" that contraband or evidence is located in a particular place. *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (citing *Illinois v. Gates*, 462 U.S. 213, 246 (1983); *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)). "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question." *Id.* (internal quotation marks omitted). "Neither certainty nor a preponderance of the evidence is required." *Id.*

Additionally, a reviewing court may not "flyspeck the affidavit through de novo review," and must give "great deference" to the issuing judge's decision. *Gourde*, 440 F.3d at 1060; *see also United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) ("A magistrate judge's finding of probable cause is entitled to great deference"). The "'resolution of doubtful or marginal cases' . . . 'should largely be determined by the preference accorded to warrants.'" *Kelley*, 482 F.3d at 1050-51 (quoting *Gates*, 462 U.S. at 237 n.10). The issuing magistrate judge "may rely on the training and experience of affiant police officers." *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002); *see also United States v. Fannin,* 817 F.2d 1379, 1382 (9th Cir. 1987) (issuing magistrate judge may rely on conclusions of experienced officers regarding where evidence of a crime is likely to be found).

### DISCUSSION

Defendant moves to suppress all evidence obtained during the search because the information in the search warrant affidavit was too stale to find probable cause to search Premises 4. Generally, "[a]n affidavit must be based on facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (internal quotation marks omitted). However, "the mere lapse

of substantial amounts of time is not controlling in a question of staleness." *Id.* (internal quotation marks and brackets omitted). Staleness is evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought." *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (internal quotation marks omitted). Information provided in support of a search warrant "is not stale if there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir. 2013) (internal quotation marks omitted).

In the affidavit, Special Agent Chad Lindsly ("Lindsly") outlined his experience in narcotics investigations and provided an overview of the investigation. Def.'s Ex. A ("Aff."), at ¶ 1, ECF 112. Lindsley's investigation was prompted by the robbery and double shooting of Whitney Archer ("Archer") and Timothy Crawley ("Crawley") in Portland, Oregon on August 3, 2017. *Id.* at ¶ 5. Lindsly believed that Brian Long ("Long") orchestrated a "drug rip" in which Archer and Crawley were shot and robbed of ten pounds of cannabis during a deal brokered by Long. *Id.* at ¶¶ 5, 15. Specific details about each place to be searched and the items to be seized were provided in attachments to the affidavit. *See id.* at Attachs. A-4, B-4 (attachments specific to Premises 4).

Relevant here, the affidavit describes Carter as a possible co-conspirator in the "drug rip." Lindsly noted that on August 3, 2017, there were ten phone calls between Long and Carter in the hours leading up to the "drug rip," and another nine calls between the two in the 5 hours immediately after. *Id.* at Ex. A. Further, Lindsly's review of historical cell site data showed that Long and Carter met up in the vicinity of Premises 4 the day after the robbery, split ways, and later met back up in the vicinity of Long's residence. *Id.* at ¶¶ 73-74.

4 – OPINION & ORDER

In an August 30, 2017 recorded jail call,[1] Long and Carter discussed Carter getting "packages off," and that Long wanted $1,100 for each of the packages. *Id.* at ¶ 82. Long told Carter she could keep the difference between the sale price and the $1,100 that he wanted for each package. *Id.* Based on the content and context of the of the conversation, Lindly believed Long and Carter were discussing the sale of pound amounts of cannabis robbed from Archer and Crawley. *Id.* Carter told Long that she needed at least two of the packages. *Id.* at ¶ 83. Lindsly also noted that during a February 2, 2018 recorded jail call between Carter and Long, Carter stated that she needed to do some "pushing," which Lindsly interpreted to mean selling narcotics. *Id.* at ¶ 158. Lindsly believed that Carter's "continued conversation" with Long "over the span of approximately six months relating to the distribution and sale of narcotics indicates that Carter is involved in the sale of narcotics on an ongoing basis." *Id.* The affidavit notes that from August 30, 2017 through February 16, 2018, Carter made or received approximately 13 calls with Long while he was incarcerated. *Id.* at ¶ 40.

"[B]ased on the temporal proximity of Carter's calling activity with Long, Carter's presence with Long shortly after the shooting and recorded jail calls between Carter and Long discussing the August 3, 2017 incident" Lindsly believed "Carter was involved in the drug rip of Archer and Cawley and assisted Long before, during, and after the incident." *Id.* at ¶ 74. Lindsly also suspected Carter of engaging in food stamp benefits fraud by failing to report the income from the alleged cannabis sales. *Id.* at ¶¶ 149-158.

Defendant argues that the affidavit fails to allege why the stolen cannabis or proceeds of drug sales would still be found in Premises 4 fourteen months after the "drug rip" and approximately eight months after the last jail call between Carter and Long. Even assuming the

---

[1] On August 17, 2017, Long was sentenced on unrelated charges, remanded to the custody of the Clark County Jail, and was subsequently transferred to the custody of the Washington Department of Corrections on August 25, 2017. Aff. ¶ 26.

5 – OPINION & ORDER

information relating to the stolen cannabis and drug proceeds was too stale, the information in the affidavit relating to Carter's cellphone was not. Defendant argues "the affidavit does not allege that Carter still had the same cellphone and does not allege any basis for why that cellphone would still be in her residence." Def.'s Reply 3, ECF 119. Defendant further contends that drug dealers often replace and discard their cellphones, and that Carter telling Long to "shut up!" during a February 2, 2018 call suggested that Carter got rid of her cellphone and it would not be located at Premises 4 eight months later.

The authority cited by Defendant is unavailing. The affidavits in those cases failed to establish a fair probability that the object of the search would be located on the person or premises at the time the search warrant issued. *See Durham v. United States*, 403 F.2d 190, 195 (9th Cir. 1968) (finding affidavit failed to provide any basis to conclude evidence would be found at the defendant's residence or person); *United States v. Grant*, 682 F.3d 827, 837-38 (9th Cir. 2012) (holding affidavit did not support the inference that the defendant possessed the murder weapon at some point, much less that he brought the gun to the appellant's home two months before the search was executed); *United States v. Solario*, 577 F.2d 554, 555 (9th Cir. 1978) (finding affidavit based on four-month old information about the target's personal possession of a firearm was too stale to support a finding of probable cause to search his parents' home).

Here, the affidavit connects the cellphone to both Carter and Premises 4 near the time of the warrant application. Contrary to Defendant's assertion, Lindsley's review of Carter's subscriber information one month before the search showed that Carter's cellphone had been active since July 2, 2017 and was registered to her at Premises 4. Aff. ¶ 138; *see also id.* at ¶ 159 ("[T]he investigation has revealed that several of the individuals still possess and actively use the

6 – OPINION & ORDER

same cellular phones they used before, during, and after the August 3, 2017 shooting including Carter[.]"). Lindsly's analysis of historical cell site data revealed that from July 2017 through January 2018, Carter's cellphone was frequently in the vicinity of Premises 4 during the expected hours of someone living at the residence. *Id.* at ¶ 139. Carter also listed her cellphone number and address at Premises 4 as her contact information in a food stamp benefits form as recently as April 9, 2018. *Id.* at ¶¶ 39, 140.

Lindsly further detailed that those engaged in criminal activity regularly use text messages to communicate with each other. *Id.* at ¶ 159; *see also United States v. Taylor*, 163 F. Supp. 3d 816, 819 (D. Or. 2016) ("Many, if not most, people who use cell phones with storage capabilities keep important information on them, so it is reasonable to believe that a drug dealer might have records of transactions on h[er] cell phone."); *United States v. Garay*, 938 F.3d 1108, 1113 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 976 (2020) ("[M]agistrate judges may 'rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found.'") (quoting *Fannin*, 817 F.2d at 1382). Contrary to Defendant's assertion that the affidavit failed to account for the likelihood that Carter had disposed of the cellphone evidence, Lindsley noted that "law enforcement has access to tools that allow the extraction of deleted text messages, including content." Aff. ¶ 159. Therefore, the information in the affidavit was not too stale to support probable cause to search Premises 4; it presented a fair probability that, at a minimum, cellphone evidence of the alleged crimes would be found at the premises. Accordingly, the Court will not suppress the evidence.

///

///

///

7 – OPINION & ORDER

## CONCLUSION

For the reasons discussed, Defendant's Motion to Suppress [ECF 104] is denied.

IT IS SO ORDERED.

Dated: _____July 17, 2020_____.


*Marco Hernandez*
MARCO A. HERNÁNDEZ
United States District Judge

8 – OPINION & ORDER